Our next case on the call of the docket is case number one one two five three zero Lawlor versus North American Corporation agenda number six. Counsel for the appellant you may proceed. Good morning your honors counsel my name is Eric Macy I am counsel for the defendant appellant in this case North American Corporation of Illinois which I will refer to as North American during the case. The basic facts which gave rise to our being here today is that our client received credible evidence of a former employee attempting to solicit one of its clients in violation of a non-competition clause. The corporation called its corporate counsel for many years asked what to do from a respective law firm. The counsel suggested to use a private investigator. The investigator was a licensed Illinois investigator. The investigator called our client and requested certain information. We provided that information to the investigator which was lawful to provide as held by the circuit court, social security number, birth date, telephone records and the circuit court held at summary judgment it was lawful to provide that and that was never challenged on appeal. After that information was provided the investigator did two things. It surveilled the home of the defendant and again on summary judgment the circuit court held that the public surveillance was lawful and that was not appealed. The investigator also obtained telephone records. What he did is he had a menu literally a piece of paper enter into evidence and used an internet service called Discover Inc and checked off what he wanted faxed it to the service and the service returned back to him handwritten telephone information. He in turn the investigator literally just faxed those same materials to the client and the client did use those materials on a few instances whereby it would check the phone numbers through a reverse directory like Google to see if those were phone numbers of either competitors or clients of the defendant. The plaintiff learns about this although the case was already pending for other reasons. It is amended and the defendant brings excuse me the plaintiff brings a claim for something called pre-texting as a invasion of privacy known as intrusion upon seclusion. I'm really unclear as to what was the cause of action here. Can you tell me what the cause of action was that was pled and what the elements are? Sure. The cause of action was intrusion upon seclusion. That is the tort. Has that been recognized in the state? It has been recognized by the first district appellate court and for that reason we didn't challenge it as a cause of action at that time. Can you tell us what the elements are? Yes. The four elements of the tort are an unauthorized intentional intrusion or prying into the plaintiff's seclusion. The second is that the intrusion is highly offensive or highly objectionable to a reasonable person. The third is that the matter upon which the intrusion has occurred or the intrusion occurs is private. And lastly an injury. I think this court discussed it without approving it in a decision called Supreme Court decision. You did not approve it. You discussed it at that point in time. You decided not to make a decision if the tort existed. But the appellate court since then have almost consistently upheld that this tort exists. And the highly offensive, and this is important, the highly offensive, highly objectionable conduct that the plaintiff claimed and it was the theory of its in case from inception was this concept called pretexting. In other words that someone, in this case this third party, discovered through some form of misrepresented that they were Ms. Lawler or otherwise and obtained that information from her telephone carriers. Now we raised several issues, but the principal issues that I'm going to address today are the punitive damages awarded that the appellate court in particular awarded. And the issue on 14th Amendment which prohibits the imposition of grossly, excessive, or arbitrary punishments on the tortfeasor. And it's a de novo review you held at that point in time. And what you did is you followed two Supreme Court decisions, BMW v. Gore from 1996, State Farm v. Campbell of 2003. And consistent with that you said there were three guideposts that we're going to look at for the application for purposes of punitive damages. And I'm going to go over each of those guideposts for this case. The first was the degree of reprehensibility of the conduct, which according to Gore says perhaps that's the most important of the, of the indicium that you should look at. And you consider five factors, and in Lowe you said you consider five factors. The first is whether the harm was caused was physical as opposed to economic. And in this case, just so the court knows, the trial court expressly found in her and admitted her, and we agree, that all factors, all due process factors, she found were de minimis. Now, whether the harm was caused was physical as opposed to economic. Here, there was minimum physical harm. She vomited, she claimed she gained weight, and she had lost her sleep, and she was anguished. But as this court held recently in Slavinsky, and although I understand it is not a constitutional case, but it was a punitive damages case, very similar if you look at Slavinsky, never saw a physician, a therapist, or a psychologist. And here, the plaintiff, notwithstanding the so-called one-time vomiting, I believe, and sleeplessness, still never saw a physician, never saw a psychologist, and never saw the therapist. No panic attacks, no nervous or mental breakdown, really no long-term or significant complications resulting from the emotional suffering. And that's what, in a constitutional due process analysis, the First District in 2011 cared about for reprehensibility on this physical versus economic. That was called Leishon versus Deal Controls, a First District 2011 opinion. And likewise, just like in Slavinsky, there was really no alteration in the plaintiff's normal daily activities, which you looked at in that case. What happens here? She didn't miss work. She's been working consistently ever since the incidents occurred. She didn't change jobs. She didn't have to move. She didn't even change her phone number, notwithstanding this issue with phone records. And her family activities really didn't change. Disney cruise, school fundraisers, family weekend in Chicago, holidays, birthdays. So on balance, we would argue that, notwithstanding a very, very limited physical harm, that with respect to that criteria, it's very de minimis, that factor of reprehensibility. The second is did the tortious conduct evince an indifference to or a reckless disregard for the health and safety of the others? What did the trial court find? No. Absolutely nothing whatsoever. No one else's health, no one else's safety was impaired by this conduct. The appellate court was literally silent on the issue. It didn't even address it. And there's no evidence of the record whatsoever that this in any way affected third parties at all, their health or their safety. The third is whether the defendant was financially vulnerable. What did the trial court held? The trial court held that the defendant, excuse me, the plaintiff was not financially vulnerable. In fact, she expressly found that the plaintiff was a sophisticated business person. What did the appellate court say about this? It ignored it. It didn't even address this particular factor. And once again, there was no evidence in the record that the plaintiff here was financially invulnerable. Indeed, to the contrary, the plaintiff, when she left her employment with the defendant here, was earning $270,000 per year. This was not a financially vulnerable defendant. That factor doesn't apply to reprehensibility. The fourth factor is whether the conduct involved repeated action or was an isolated incident. In low excavating, this court talked about both internal and external recidivism. Let's talk about it. First, you said the trial court can look outside the misconduct committed toward the plaintiff to other similar conduct when considering the recidivism factor. And you also said that the court may look internally to defendant's conduct toward the plaintiff. And the court, importantly, in low excavating, you came to the conclusion after reviewing these cases that each had a pattern of misconduct that typified the manner in which they did business. In other words, does this company, did this defendant do business this way? Here, let's talk about external first. No evidence whatsoever that this company engaged in this conduct with any other person ever. What did the appellate court rely on? It said it did it in two instances. But those two instances, if you read the appellate court decision and you read the trial court opinions, were based on an offer of proof. It was not evidence. It was not evidence to the trial court. It was never presented to the jury. And in fact, the appellate court never ruled that this offer of proof was evidence that otherwise should have been submitted to the jury. And had they ruled that, they would have had to have remanded the decision back to the circuit court. So I would have had an opportunity as the trial lawyer to object to the very evidence that they were trying to get in as this supposed called recidivism. It had no evidence whatsoever of that recidivism. And even if you decided to look at the offer of proof, we won on motion in limine and on repeated instances in the trial court that they couldn't put this evidence in because there was no evidence of pretexting. There was no evidence that in any case, there was one case, one woman by the name of Hall, I believe, where her phone records were obtained. But there was no evidence that they were obtained by pretexting, and that was plaintiff's case since inception. So at the end of the day, there is simply no evidence of recidivism to other people. Lastly, as to internal, there were five occasions where her phone records were obtained, where this private investigator on five instances, I think over several months, got the handwritten records and turned around and faxed it to our client. What happened in BMW, which this court relied on it in Gore? In BMW, there were 14 instances where BMW literally represented to the public in the state of Alabama that the cars were new when they had had some damage to them anyway. Okay? Now, notwithstanding those 14 instances, the Supreme Court held that there was no evidence that BMW persisted in a course of conduct, this is important, after it had been adjudged unlawful on one occasion, let alone repeated occasions. And therefore, the court didn't consider BMW to be a recidivist, notwithstanding the 14 instances. What did you say in Lowe? What did you say in Lowe? Lowe would involve the union. And in Lowe, you said you had a union picketed signs it knew, it knew were false on more than one occasion with the intent to interfere with the plaintiff's business. What about here? North American did not persist in a course of conduct after it had been adjudged unlawful. There is no evidence that North American knew that the records were obtained by pretexting. And just like Lowe excavating, there is no evidence of a pattern of misconduct that typified the manner in which the appellant did business. Therefore, we maintain there is no basis for recidivism here. Last, not last, but the next issue is whether the harm, the fifth element of reprehensibility or factor, is whether the harm was the result of intentional malice, trickery or deceit or mere accident. What did the trial court say? The trial court said that the defendant, North American, undertook the investigation to protect its business based on credible information it received and not with the intent to harm the plaintiff. This was not disputed by the appellate court. The appellate court nowhere said that the trial court was wrong in this finding. In fact, the evidence was clear that North American got the records from the private investigator and what did it do with it? It did not publish these records? Counsel, wouldn't a jury verdict alone indicate the defendant knew its conduct was illegal? With all due respect, Your Honor, no. First of all, this is a, this question is here de novo because we are challenging the trial court's decision to deny our motion for directed verdict to send this to the jury. Second of all, this is a de novo review for the 14th Amendment constitutional issue and also we did a post-judgment motion where we raised this matter which was and this was, that makes it de novo review. Second, third of all, we were also appealing the, the increase of the, by the appellate court of the trial court's formiditor which is an abuse of discretion standard and in nowhere did this trial court ever look at whether or not the, did the appellate court address whether the trial court abused its discretion. It's literally silent as that fact and we maintain just substituted its own judgment. And last, this court has ruled and I believe in a, a recent decision, 2009 appellate court decision actually which Justice Tice authored called Blount v. Stroud in 2009. The, the, the rule is that whether or not there are sufficient facts to even go to the jury for purposes of punitive damages is a decision that the court makes. And we're saying the court should have made the decision that that shouldn't even have gone to the, to the jury. Lastly, to the extent that there was a special verdict is consistent with the general verdict. So I believe the, the special interrogatories are meaningless for purposes of this decision and you look at the entire verdict. So getting back to my point, the question whether it was intentional malice, trickery, or a seat or mere accident. And the trial court found in its de novo review of the constitutional issue, okay, that it was undertook as an investigation to protect the business. Now, I think the key evidentiary point here is that what did we do with these records? We didn't publish them. We didn't submit them to people. We didn't give them to anybody. So they could find out who she was or who she was talking to or anything like that. We literally looked at them. And in a few instances, check those numbers in a reverse directory to see if she was talking to competitors or clients in violation of her non-con. That is a business purpose, okay? The evidence is clear, okay, that there's no evidence with an intent to harm the plaintiff, okay? Unlike Blount v. Stroud, which Justice Tice authored, there was no intention to threaten the plaintiff, no intention to intimidate her or make her suffer. We only used the information for a business purpose, and we didn't publish or use it to damage her reputation. Now, I will concede, as I must, okay? Counsel, I want to make sure I get your issues straight here. I know you have an issue with respect to the $1.75 million, and you make a due process argument with respect to that. I know you have an issue on the $1.75 on a common law basis, and then there's the agency issue, right? That's correct. And the counterclaim issue. Now, in response to, on the breach of fiduciary duty as to plaintiff, in response to Justice Freeman, it seems like you're also making an argument with respect to why there wasn't a directed finding. Is that part of your, that's part of your claim as well? On the, on the... I'm, I'm trying to understand. I just picked up something you said. Are those the issues, or do you have an additional issue? Those are, I think you've articulated all the issues. All the issues. There's, there's three punitive damages issues. Fourteenth Amendment, okay, common law, and this Court's decision in a case called Matt Yasoski as to whether we can be liable for, vicariously, for the tortious conduct of, under punitive damages of those agents. Then there's the issue that the appellate court decided throughout both our, our entire counterclaim, and then we, we appealed that. That's before you, too. That is correct. Okay. Today I was only... I probably just misheard something that you said. Yeah, yeah. And there are multiple levers of standard of review, depending upon which of the particular claims you're looking at and which issue in those, and I can address those. It's important we address them in our brief, but I, I, I tried to address them to some extent in my response to Justice Thomas. Okay. All right. I just wanted to make sure I was clear on that. Thank you. So, what I said is I, I have to concede that pretexting, the tort, the tort that we're talking about, pretexting, is, is an action which has trickery or deceit in it. I mean, they couldn't have gotten these phone records, under the theory of their case, unless someone stated they were Ms. Lawler, or somehow did something with the phone companies to get the records. And I think there are a plethora of cases in, in the appellate courts where when you have a, a tort, an intentional tort, the conduct that constitutes the element of, of the claim is, is insufficient to also constitute punitive damages. We cited the Parsons decision as one example. It was a fraud case. Yes, there was the scienter for fraud, but what happened there is the plaintiff tried to use the same scienter for fraud to satisfy the punitive damages criteria. And that's, I believe, what's going on here. The plaintiff, the, the plaintiff concedes that, that pretexting involves intentional trickery. And we would maintain that in this case, where the, the harm was not intentional malice, and even though the tort otherwise involves intentional trickery, it shouldn't be given the rate that it typically otherwise would have been given because it was needed for part of the elements of the underlying claim, and the compensatory damages, as this court held it low, satisfied the plaintiff for that alleged or that proven trickery. She's already been compensated for that in the compensatory damages. The second guidepost, so we would argue reprehensibility in this case is very, very, very low based on all the factors. The second, which raises a, the big constitutional issue here, is the disparity between the harm suffered and the punitive damage awarded. In this case, it's 27 point, 27 is the ratio, 21.75 million to 65,000. What did the appellate court did? All it did, all it did is it took attorney's fees, unrewarded attorney's fees by statute or common law or otherwise, never awarded by the trial, by the jury, never awarded by the judge, and added those punitive $600,000 of attorney's fees to the $65,000 of punitive damages, I mean compensatory, gets 665 and says, gee, that's about three times 1.7, I satisfied the ratio, end of story. Now, with all due respect, that is contra low, is contra the Blount decision from the first district in 2011, and it's common sense. What happened in Blount? The fees were awarded under Section 1988 of the Civil Rights Act for violation of Section 1981 in the Civil Rights Claim. The court held that the, these fees were compensatory, and it, it did an extensive review of case law and cited case laws from other jurisdictions that says, when you have legal fees that are awarded as compensatory damages as part of the underlying claim, you can add those to the actual compensatory damages because they are compensatory and use that for the ratio, and that was Justice Tice's other decision. And she also relied on another decision from 2008 from the second district called Kirkpatrick versus, I believe, Strasburg under the Consumer Fraud Act where the same thing was done. The plaintiff obtained legal fees under the Consumer Fraud Act, and when the 14th Amendment challenge went up, they added those, the court appropriately added those awarded fees as compensation under the act to the plaintiff's compensatory damages, which in that case were nominal, and they got like a 3.5 to 1 ratio, which was consistent. Mr. Macy, your time has expired.  Counsel for the appellee. May it please the court, counsel, my name is Mitchell Catton. I'm here with Josh Diller, and we represent Kathy Lawler, who is also present in court today. We are asking that this court affirm the appellate court decision, including affirm the verdict, and I stress this because the verdict was for intrusion upon seclusion. There was never a claim filed for pretexting. We're asking that this court affirm the punitive damage award, and I think if anything is clear, that if a punitive damage award is going to be meaningful, if it's going to do its job, if it's going to serve the significant state interest of punishment and deterrence, it's got to be enough so that the jury found. We also ask that this court affirm what the appellate court found in reversing the breach of fiduciary duty verdict. It is against the manifesto weight of the evidence. One component of that award was based on the dissemination of confidential information. Even though we had to fight that count, even though we had to have extensive briefing on it, the defendant got up in oral argument in the appellate court and admitted that the information was not confidential in a legal sense. I'd like to give you a brief overview of the case, spend a very short amount of time on knowledge, the defendant's knowledge, and then get right to punitive damages. As I mentioned, it's an intrusion upon seclusion case. There is no element of pretexting. It is intrusion, the prying into the private affairs of another. Now, it can be done by looking at one through binoculars. It can be done in a lot of different ways. But pretexting is not an element. And in fact, fraud and deceit are not elements. And it's the fraud and the deceit that the defendants used in this case that is the reason why punitive damages are warranted and necessary to deter and punish this type of conduct. So what are the elements of this tort? Highly offensive conduct. An intrusion into the private affairs of another. And harm. Now, in our case, there was agreement by the parties that phone records are a private matter. But that would be the fourth prong. But the parties had agreed to that. It's not pretexting. It's not one of the elements of the offense. The highly offensive conduct is. That's an element for compensatory damages. Absolutely. But counsel, I'm not sure if I'm following. How did you you said the fourth was the agreement? That's not the fourth element. No, I'm sorry. The fourth element is that the matter that was pried into is a private matter. And here it was that what was not disputed is that North American obtained the phone records of Kathy Lawler. Yeah, I followed that. I just thought you had mentioned that twice about the privacy. The private matter. Well, the prying into obtaining something that what's prying into has to be a private matter. And then the harm. And it's that the reasonable person would find it to be highly offensive. So I apologize if I wasn't clear on that. This is I have a question, though, under Magner. I think it's Magner. An employee is held accountable for breaching its fiduciary duty to the employer when he commences the business. It commences business as a rival concern while still in the employer's service. Now, is it true that the record reflects that there was evidence that while the while still working for a defendant, the plaintiff tried to convince MapQuest to give its business to Shamrock? Why is this not a breach of loyalty? I believe it's not a breach of the loyalty because there was no admissible evidence of Kathy Lawler trying to take the business anywhere but to North American. And in fact, her original claim, her original complaint did not even include a count for intrusion upon seclusion. It was a procuring cause claim. She brought her suit because she wanted the benefit of the business that she had brought into North American. The only evidence in the record supporting the breach of fiduciary duty verdict is an affidavit of Kevin Bristow that was disavowed at trial. That's the only evidence they had. But that is evidence and the jury can make a decision, correct? Well, no, because it was all hearsay and it was a claim tried to the trial court. But an affidavit is not admissible. It's hearsay. And the person who wrote the affidavit testified that none of the statements in it were true. And interestingly enough, Mr. Bristow signed the affidavit on the hood of a car. He was given a very short amount of time. He was told he had to sign and who had raised him as a child. And he met somebody from North America at the O'Hare Oasis, signed it. They brought a notary there. So that was it. There was evidence from an affidavit that was introduced and there was testimony. No, there was no testimony. As to the statements within the affidavit, he denied them, he denied them. So he took the stand and denied the affidavit and the jury made a decision which one it believed. Well, the trial court made a decision. That claim, the breach of fiduciary duty claim was tried to the trial court. The trial court decided between the truth of the matter asserted in the affidavit and the testimony in court. Exactly. And what the trial court said in its opinion, in order, that's attached in the supplemental record, that it believed the affidavit over Kevin Bristow who signed it. So she finds that she found him incredible in court, but yet somehow believed the affidavit, which to me doesn't make any sense. How does a court review that? I think that's got to be a, uh, I think it's a matter of, I think it's a matter of credibility. No, no, because I don't think it could even come in. I think the entry of evidence is abuse of discretion. But here were the, and I think the appellate court was right to find that it was against the manifest wit of the evidence, to find against Kathy Lawler on these claims based on the, uh, evidence that was admitted. Um, but what's interesting is despite this massive investigation, despite getting 700 phone records over a period of five months, despite sending subpoenas to all their customers, despite spending $30,000 in investigation, they didn't come up with a single person with personal knowledge that was able to testify about Kathy Lawler trying to take any business from North American. There was no admissible record supporting that. And the court's opinion, when you look at it, says that it is based on the affidavit. And in fact, North American's counsel in the closing argument before the trial court on that issue said, I agree with the affidavit. If you believe Kevin Bristol's testimony on the stand, I can't win. But if you believe the affidavit, then I have a clear case of, uh, breach of fiduciary duty. And your position hinges on the appellate court said the affidavit should not be, have been admitted as substantive evidence. And if they're correct on that ruling legally, the only thing you're left with is the testimony of the affiant, right? That's true. That's true. Okay. Yeah, I don't disagree. So they're basically saying the appellate court was basically, it's a manifest way to the evidence standard, but the appellate court was saying that there was no evidence. Yes. Once they throw out the affidavit. Yes. A complete failure of evidence. Okay. Um, so I'm clear. Was the affidavit actually admitted, received into evidence or not? It was over our objection. But yet, yet the affiant testified and testified contrary to that. That's right. Okay. Um, in this case, the factual basis for the claim, I believe, and what started this claim was not misconduct by Ms. Lawler that nobody ever knew about. What started this action was that Ms. Lawler appeared to have brought in the most lucrative, um, business of her career. And immediately when she brought this in, four months before her dismissal, um, North America tried to separate her from the business. And they brought in new employees. They told her to train employees to take over. And eventually they gave her an ultimatum. They said, unless you sign a new agreement, waiving your right to commissions on the MapQuest business, your employment's over. And rather than accede to their wish, her employment ended. And at that point, the highest ranking members of North American began, became involved in the investigation. The president testified that he started the investigation and that he wanted to get Ms. Lawler's phone records. And he authorized the employees to take information that had been maintained, supposedly under lock and key, to give that up to their investigator of 10 years, his agency called Probe, to get her phone records. That's why they gave him the information. Um, and then the investigators called the phone companies, fraudulently portrayed themselves as Lawler, convinced the phone companies that they were talking to Kathy Lawler, and they released this information. Um, the, the evidence of their knowledge is overwhelming. I started with the government. I was an appellate defender. And if their statement as to knowledge is right, then I would have had a much easier time in my job. Knowledge is proved circumstantially. Even in criminal cases where one has to prove knowledge beyond a reasonable doubt, it's proven circumstantially all the time. You can't get into somebody's head. You've got to look at the surrounding facts. And here, it's impossible to say they didn't know what they were doing. And it's impossible to say that there was no evidence from which the jury could find, uh, could not find that there was knowledge. They started the investigation to get her phone records. They gave up the very information needed a pretext. They received information repeatedly over five months. They never said, why are you sending me this? They ordered more. It was the highest officers of the company that Googled the numbers. Mr. Katton, are you saying that they also distributed or published the information they got? Other third parties? No, I'm, I'm not suggesting that, but, but I, I, I'm just suggesting that they were, well, the dissemination was within what was called the leadership team of North American. But I think it's really throwing the court in the wrong direction to compare this to a defamation claim. Intrusion upon seclusion is the prime into one's private affairs. Publication is not an element. The fact that there was not a widespread publication is really irrelevant to the claim and does nothing to diminish the severity and the reprehensibility of their conduct. And I, I want to make sure that I get to the punitive damages. But I, I think it's important to remember that once the court decides that a case should go to the jury on punitive damages, it is a highly fact intensive inquiry. Yeah, and, and in, in light of that, the, what about the appellate court's opinion would indicate that the trial judge who heard everything and sat there as to the things that have already been discussed by opposing counsel and about to be discussed by you was an abuse of discretion by the trial judge. Sure. In issuing that remand. You know, there were a number of issues. Number one is the, I'm sorry, the trial court usurped the role of the jury. It made factual determinations as to the reason for the fact finder, not the trial court. Additionally, the trial court abused its discretion because it said, and if you look at the record, this is what it says, the jury didn't have the ability to consider Lawler's conduct as to North American, and therefore, I can make a decision based on a global resolution. I could take everybody's conduct into account. There's a couple problems with that. Number one, it usurps the role of the fact finder, but even more importantly, the whole defense of North American. Everything they presented at trial was a business justification defense. It's what they started with And the jury actually heard counsel for North American read from the affidavit in the closing argument and say, we had incredibly damning information. Based on this information, what else could we do? And read all these allegations and the jury heard it and rejected it. The jury heard it and considered what would be appropriate when someone intrudes into one's privacy, uses fraud and those two things. Additionally, it was an abuse of discretion for the court to impose a global result. The court was deciding the breach of a duty claim. The jury was deciding the intrusion claim. It was not within the province of the court to decide, here's the global number that I think we should get to. And it's clear she did that because she used what she perceived to be Lawler's conduct to increase the punitive damage award to North American. She used it on both sides. It was double counting Lawler's conduct, but Lawler's conduct should have been judged by the jury. Additionally, Lawler's conduct is not an affirmative defense. Excuse me, what could the trial court have taken into consideration if it were going to exercise its right to a remittiture? It could have decided if the jury's verdict was a product of passion, partiality or corruption. In this case, there really was an evidence of that because the jury found for Kathleen Lawler on some counts, it found for North American on some counts. There was nothing in the record to find that. There was nothing in, and the one thing I should add is that when you look at the special interrogatories, I don't believe you just ignore them, but they show that the jury made reasoned decisions. They found against Lawler on her claim that they took mail from her, but they found for Lawler on the claim that they intruded upon her seclusion through this pretexting scheme. And additionally, I think an important factor is that the trial court's understanding of the evidence was just incorrect, and that's why the appellate court found that the findings on the breach of fiduciary duty claim were against the manifest way to the evidence. There was simply no evidence that the evidence did not contain confidential information. There was no testimony from anybody that there was a restrictive covenant or confidentiality agreement. There was no testimony from anyone that they ever told Kathy Lawler she could not disseminate that information. There was no evidence that that information constituted a trade secret. The information was within Kathy's head. It's the pricing she did on her work in her sales. It's her own work, and she's using it to interview. She's not using it to compete, because when she sent the letter, she did not even know about the new MapQuest opportunity. And I think the coup de grace is that defense counsel got up in the appellate court argument and said the information wasn't confidential in a legal sense. So how can the court, and the trial court said that this was the most egregious part of her conduct. And the trial court said because she gave out confidential information, she's going to have to discourage for that. So the trial court thought that was the most egregious conduct that she had evidence in front of. And it's a letter that the defendant admits doesn't contain confidential information, so how can it support what the trial court did? And then with respect to the Bristow affidavit, and the use of the Bristow affidavit was substantive evidence. It's an abuse of discretion. You know, the problem with hearsay is it's inherently improbable. And especially in this case where there's no substantive evidence corroborating it, how do you take that evidence and impose a $500,000 punitive damage judgment against a worker who for the prior seven months brought in over $300,000 of business and was only paid when she generated profitable business? It is an abuse of discretion. It just can't follow. It can't follow. I believe the evidence ‑‑ Counsel, could you, in the few minutes you have remaining, could you comment on the inclusion of the attorney's fees in the punitive, consideration of the ‑‑ Sure. I think it's important to look at what this court said in Lowe. And in Lowe, what this court said is you can't use fees on the front end to determine the punitive damage award. You can't use it as a way to give punitive damage ‑‑ I'm sorry, you can't look at one's attorney's fees on the front end to determine the appropriate amount of punitive damage award. But the court did find that it's proper to consider one's attorney's fees, and the cost of litigation in determining what is a reasonable amount to both punish and deter a defendant. And the court clearly indicates that attorney's fees may be used after the jury comes back to determine whether or not the award complies with constitutional standards. And that's what the court did in this case. I think it's important to point out the jury was correctly instructed. There's no argument that's ever been raised about the instructions. And the jury was not authorized to consider attorney's fees in coming up with the punitive damage award. It's not a case where the jury put that into their computation. What the court did, the appellate court did, is they said if you look at everything that went on in this case, and you look at this record, if we are going to allow a defendant to make it so difficult to get an attorney to protect such a fundamental right as a right of privacy, no one will ever be able to file suit. And if you look at the cases that we cited, Mathias and Continental Tread, what the courts did in those cases, they said the wealth of the defendant goes into the equation, the cost to safeguard one's rights goes into the equation as to the reasonableness of the attorney fee award. Your time has expired. I would just simply thank the court and ask them to affirm the appellate court. Thank you. I have a few points. The cause of action was invasion of privacy, intrusion upon seclusion. But the theory of the case of highly offensive was from inception through trial, through post-trial, through these appellate briefs, pretexting. And indeed, the jury instructions themselves, if you review the record, specifically use pretexting as the language for the highly offensive conduct. Next is the affidavit, which questions have been asked. Mr. Bristow gets on the stand. He attests to the affidavit. Yes, I signed it. Yes, I signed it under oath. Yes, I specifically used these words in the affidavit when I did it. Yes, yes, yes. Then he says, but they weren't true at the time I did it. Now, the judge determined that that was sufficient and she literally said in her ruling, I don't believe. I think he's literally not telling the truth. I believe what he said in the affidavit at the time. She chose to believe the affidavit. And that's not all she chose to believe. She identified significant additional things in the record. And indeed, I think the appellate court even mentioned it. Mr. Bristow told North American that Lawler was trying to steal the business based on testimony of Todd Van Paris, which was not objected to. Even though that might have been hearsay, they didn't object to it. And once they opened the door, everything else comes after that, as we note in our reply brief. He signed the affidavit. He admits he added a paragraph to the affidavit stating that he warned Lawler not to compete. He signed a second can't, the first affidavit, until trial years later, and on and on. Is the ruling of the appellate court, though, that that affidavit only comes in for purposes of impeachment? And therefore, let's just say that the reverse of what you've said is the way it happened. That the the fine is on the stand and he says this didn't happen, this didn't happen, this didn't happen, this didn't happen. You know, sir, didn't you sign this affidavit and didn't you say in this affidavit these things? Well, he's impeached. Yes. So she can discount his testimony. Yes. She can choose not to believe it. Right. And she can choose not to believe his testimony, right? But, and it might be a distinction without merit and often is lost on a jury. I understand. In this case, we're dealing with a judge. That's right. But isn't to take what was in the affidavit that was used for impeachment for, as substantive evidence. I agree with the court. But what I, what I don't agree with, at least what has been articulated here, is that there was other evidence in the record that she specifically identified was the basis for her decision that was not just the affidavit. So her, both her disbelief coupled with that other in the record was sufficient for the award, the breach of fiduciary duty. I also want to point out it's important that the issue of punitive damages amount is not a jury issue because the appellate court, okay, included, added the fees to the, get the ratio to say it was okay. All right. All the appellate court did, and it was honest. I'm adding the fees to make sure the lawyers get paid. All right. And then there'll be some extra for the, for the plaintiff. That's what you can't do. You cannot do that. And that's what you set it low. You can't, in fact, what you did in low, the fees were a half a million, over a half a million dollars for the plaintiff. Over an 18 year period, they fought that union. Okay. Over an 18 year period. And what did you do? You remitted it, okay, to $50,000, which was 10 to 1, I think, or 11 to 1 for the $4,800 compensatory damages. Here the compensatory damages were significant. They were $65,000. Okay. And you said in low, gee, I, I understand it was a lot of legal fees, but I can't just use punitive damages to write people a check for legal fees. I have to, what you're looking at is conduct. Punitive damages looks at conduct, not the individual. Okay. More than anything else. So, the other point I would make is that as to Justice Burke, Slavinsky, the issue of publication would go to whether there was an intent to harm. I disagree. And likewise, on punitive damages for due process purposes, whether there was publication or improper use would go to reprehensibility, which we maintain was very low by reason of no publication. It's also important, very important, that the, our position is, is that the trial court made findings of fact de novo, which it was entitled to do with respect to the constitutional issue. Okay. It wasn't usurping the jury's function. It was looking at the entire record, all of which the jury heard too. And this business about our business justification defense, we didn't, we don't have any affirmative defense of business justification. That was an issue as to whether what a motive of our conduct was for purposes of, as to whether or not it was intentionally malicious to give rise to punitive damages. However, we don't know what the jury did, whether it believed or didn't believe on that. There was no special interrogatory. We don't know that it rejected or didn't. But we do know what the trial court did, who looked at all the evidence, credibility of all the witnesses, and evaluated point by point what you did in low and said, based on that, I'm making a decision. And the appellate court under, under nowhere said that she abused her discretion to do that or identified on what basis she abused her discretion to get that. It literally just says, we disagree. We're going to substitute our judgment. The appellate court can't do that. And I believe that was the basis of Judge Kilbride's dissent in Slavinsky, the one point. And I would agree with what he said at Slavinsky, at least as to respect to the remitter issue. Although we argue that the punitive damage under this Matt, Matt, Matt Yasoski case, that we can't be liable for the punitive conduct of an agent. In this case, not just an agent, but a sub-agent. This company Discover, they didn't even talk about that in the appellate court. This company Discover, we didn't control. Probe didn't control. They sent a, you know, the, the essence of control, as you've articulated in the, the Halliburton Root case recently, and I know it was an attorney malpractice type of an issue case, but you, you spent a lot of time in that case talking about what an agent is and what an independent contractor and the scope of liability. And that case is very clear that in the absence of the type of control over, over, over a third party, even if an independent contractor, it just can't make them an agent. And that's exactly what happened here. We just don't see this with this, this Discover. They literally, the only evidence is they, they faxed literally a menu of checkpoints to the company, and the company sent back handwritten notes of telephone records. We didn't, nothing was controlled. We sure didn't control it, and there's no evidence that Probe, the private investigator, controlled Discover. And if Discover was the one, which seems to be the theory of the case, that they're the ones who went out and you can impute out of that knowledge to us when we didn't know about it, and I don't know how you can impute that we somehow controlled this Discover, let alone controlled Probe, any more than you control your painter when you say, please, paint the house, I want it red, and you look at the results. That's what an independent contractor is. You cited the Anderson decision in Holabird. It was a Seventh Circuit decision. You look at the results for an independent contractor. The results we wanted, we got the records. We didn't look at the manner in which they were tamed or the source of how we got them. That's why they are independent contractors. And the appellate court literally ignored Discover completely. With that, we have multiple levels of relief we seek depending on the different claims. And with all of that, I will thank the court, and it has been a privilege to be here and have an opportunity to argue in front of you. Thank you. Thank you. Mr. Macy, Mr. Catton, thank you for your oral arguments today. Case number 112530, Lawler v. North American Corporation of Illinois, is taken under advisement as agenda number six. Mr. Marshall, the Illinois Supreme Court stands adjourned until Tuesday morning, March 20, 2012, 930 a.m.